# United States Court of Appeals
## For the First Circuit

———————————

No. 15-2127

UNITED STATES OF AMERICA,

Appellee,

v.

NEFTALÍ ALVAREZ-NÚÑEZ,

Defendant, Appellant.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

———————————

Before

Thompson, Selya and Kayatta,
Circuit Judges.

———————————

Rafael F. Castro Lang, with whom Edwin Prado Galarza was on
brief, for appellant.
Mainon A. Schwartz, Assistant United States Attorney, with
whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson
Pérez-Sosa, Assistant United States Attorney, Chief, Appellate
Division, and Francisco A. Besosa-Martínez, Assistant United
States Attorney, were on brief, for appellee.

———————————

July 8, 2016

———————————

**SELYA**, __Circuit Judge__.  In this case, the sentencing court confused the message with the messenger.  That led the court to blur the line between the artistic expression of a musical performer and that performer's state of mind qua criminal defendant.  Concluding, as we do, that this line-blurring undermined the plausibility of the court's sentencing rationale (and, thus, rendered the sentence substantively unreasonable), we vacate and remand for resentencing.

## I.  BACKGROUND

Defendant-appellant Neftalí Alvarez-Núñez was arrested in March of 2015.  The arrest took place after police observed him discarding a handgun outside of a bar in Cataño, Puerto Rico.  When retrieved and examined, the handgun proved to be loaded, fitted with an extended magazine, and modified to fire as a fully automatic weapon.  A subsequent search revealed two other items of interest: the defendant was in possession of a large quantity of ammunition and a half-dozen Percocet tablets, for which he lacked a prescription.  The defendant later told investigators that, in addition to being a regular marijuana user, he had been addicted to Percocet, a controlled substance, for roughly two years.

In due course, the defendant pleaded guilty to a two-count federal indictment charging him with possession of a firearm and ammunition by an unlawful user of a controlled substance, see 18 U.S.C. § 922(g)(3), and possession of a machinegun, see id.

- 2 -

§ 922(o).  Following the plea, the probation department prepared a presentence investigation report (the PSI Report) that contained, in its section on offense conduct, a surfeit of information about the defendant's musical pursuits.  Of particular pertinence here, the PSI Report noted that the defendant, under the stage name "Pacho," formed part of a musical group known as "Pacho y Cirilo."  The Report further indicated that Pacho y Cirilo was "fairly known" in the locale where the defendant was arrested, including within the Juana Matos Public Housing Project (JMPHP).  It went on to state that "[t]he majority of the songs recorded by Pacho y Cirilo promote violence, drugs and the use of weapons and violence" and in "recent years, the JMPHP has been known to be associated with murders, drug sales and smuggling and weapons trafficking."

The PSI Report set out a proposed sentencing framework.  It grouped the two offenses of conviction, see USSG §3D1.2(d); confirmed that the defendant had no prior adult record and placed him in criminal history category (CHC) I; pegged his base offense level at 20, see id. §2K2.1(a)(4)(B); noted that he had fully accepted responsibility and applied the corresponding three-level downward offense-level adjustment, see id. §3E1.1; and calculated a guideline sentencing range (GSR) of 24 to 30 months (based on a total offense level of 17 and CHC I).

- 3 -

The PSI Report also suggested a potential reason for imposing a sentence above the GSR: returning to the defendant's musical stylings, the Report rehashed his involvement in Pacho y Cirilo and the group's connection to the JMPHP.  In a similar vein, it reiterated the claim that the group's songs "promote violence, drugs and the use of weapons and violence, as . . . can be seen through their videos which are readily available [o]n the internet."  The Report included certified translations of two songs performed by Pacho y Cirilo ("Dicen Que Vienen Por Mi" and "Como Grita El Palo"), as well as a certified transcription of a music video ("La Calle Es Pa Hombres").[1]

Prior to sentencing, the defendant objected to the PSI Report on the ground, inter alia, that consideration of his performances with Pacho y Cirilo would infringe his First Amendment rights.  The defendant raised this objection again at the outset of the disposition hearing.  The government doubled down, not only resisting the defendant's objection but also introducing at sentencing excerpts from yet another Pacho y Cirilo music video (for the song "Como Grita El Palo").  The district court watched the video and commented that it included rifles and grenade

---

[1] Portions of the first two songs performed by the defendant are reproduced in the appendix to this opinion.  Because the record does not specify which portions of "La Calle Es Pa Hombres" the defendant performed, nothing from that work is included in the appendix.

launchers, along with children.   After an extended colloquy, the sentencing court ruled that it could consider the defendant's musical pursuits in crafting the sentence.

The court, without objection, adopted the guideline calculations adumbrated in the PSI Report.   It then proceeded to impose a 96-month term of immurement — more than three times the top of the GSR.   This timely appeal followed.

## II.  ANALYSIS

Appellate review of a criminal sentence has both procedural and substantive dimensions.   See United States v. Clogston, 662 F.3d 588, 590 (1st Cir. 2011).   In both dimensions, we assay the challenged sentence under the abuse of discretion rubric.[2]   See Gall v. United States, 552 U.S. 38, 51 (2007); United States v. Narváez-Soto, 773 F.3d 282, 285 (1st Cir. 2014).

Typically, a reviewing court will address claims of procedural sentencing error before addressing a claim of substantive unreasonableness.   See Gall, 552 U.S. at 51; United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008).   Here, however, the defendant's claims of sentencing error are inextricably

---

[2] The government asserts that a more rigorous standard of review should apply because the defendant did not challenge the substantive reasonableness of the sentence below.   This assertion elevates hope over reason: the defendant, ably represented, objected both strenuously and repeatedly to the consideration of his protected conduct at sentencing.   Those objections sufficiently preserved the claim of error advanced on appeal.

intertwined and are best captured by looking at the sentence through the prism of substantive reasonableness. We proceed accordingly.

The hallmark "of a reasonable sentence is a plausible sentencing rationale and a defensible result." Martin, 520 F.3d at 96. And when — as in this case — the sentencing court has varied substantially from the GSR, its stated justifications for the sentence must be correspondingly more compelling. See Gall, 552 U.S. at 50.

In the case at hand, the defendant contends that the district court's unbridled use of the lyrics he performed with Pacho y Cirilo and the music videos violated his First Amendment rights, undermined the legitimacy of the court's sentencing rationale, and rendered his sentence substantively unreasonable. We approach this contention with a degree of circumspection. As a general matter, "the sentencing authority has always been free to consider a wide range of relevant material." Payne v. Tennessee, 501 U.S. 808, 820-21 (1991). This freedom allows "an inquiry broad in scope, largely unlimited either as to the kind of information [the sentencing court] may consider, or the source from which it may come." United States v. Tucker, 404 U.S. 443, 446 (1972).

In keeping with these broad boundaries, the Supreme Court has held "that the Constitution does not erect a per se

- 6 -

barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." Dawson v. Delaware, 503 U.S. 159, 165 (1992). At the same time, though, "a defendant's abstract beliefs, however obnoxious to most people, may not be taken into consideration by a sentencing judge." Wisconsin v. Mitchell, 508 U.S. 476, 485 (1993). The upshot is that conduct protected by the First Amendment may be considered in imposing sentence only to the extent that it is relevant to the issues in a sentencing proceeding. See Dawson, 503 U.S. at 164; United States v. Stewart, 686 F.3d 156, 167 & n.10 (2d Cir. 2012).

Given the kaleidoscopic array of factors ordinarily in play at sentencing, see 18 U.S.C. § 3553(a), protected conduct may be relevant in a multiplicity of ways. For instance, it may legitimately be used to rebut mitigating evidence proffered by the defendant. See Dawson, 503 U.S. at 167-68; United States v. Kane, 452 F.3d 140, 143 (2d Cir. 2006) (per curiam). So, too, it may be used to evaluate the degree of the defendant's remorse, see Stewart, 686 F.3d at 167, the likelihood of reoffending, see United States v. Simkanin, 420 F.3d 397, 417-18 (5th Cir. 2005), or the extent of punishment needed for deterrence, see United States v. DeChristopher, 695 F.3d 1082, 1099 (10th Cir. 2012). But any such connection must be established, not merely assumed, in the context of the particular case. Where protected conduct has no bearing on

- 7 -

either the crime committed or on any of the relevant sentencing factors, consideration of that conduct infringes a defendant's First Amendment rights. See Dawson, 503 U.S. at 168.

Dawson illustrates this point. There, the Court examined the admission at sentencing in a murder case of a statement about the racist beliefs of the Aryan Brotherhood, of which the defendant was a member. See id. at 162. The Court concluded that, in the absence of evidence linking the statement to some issue in the case (say, that the Aryan Brotherhood was "associated with drugs and violent escape attempts at prisons" or "advocate[d] the murder of fellow inmates"), the statement was "totally without relevance to [the] sentencing proceeding." Id. at 165. After all, it did not actually connect the defendant's membership in the group to any aspect of the crime or the defendant's personal characteristics, nor did it rebut the defendant's mitigating evidence. See id. at 166-68.

The government submits that, under the Dawson standard, the district court's reliance on the lyrics and music videos as part of its sentencing rationale passes muster. On its account, the lyrics and music videos "promote[] the use of drugs, violence, and weapons" and, thus, implicate a slew of sentencing factors. These include the nature and circumstances of the offense, the defendant's personal history and characteristics, his motive for possessing a machinegun, the need for deterrence, and respect for

- 8 -

the law.  Relatedly, it suggests that the lyrics and music videos contradicted one of the defendant's asserted justifications for a more lenient sentence: that he possessed the weapon merely for self-defense.

The government's arguments track the district court's approach to the protected conduct.  The court acknowledged that "you cannot sentence somebody because he's a musician," but nevertheless concluded that "the lyrics of this music confirm . . . this individual's involvement with firearms, with violence, with murders, in the context of a community like the [JMPHP]," particularly given that the housing project is "known as a no man's zone" where drug trafficking and murders take place.  The court later described the lyrics and music videos as bearing on the need for deterrence because they comprised "written and visual confirmation" of the defendant's "inclination as to violence, his liking to violence."  The court reasoned that these materials provided "objective evidence that lets you reach the conclusion that this [crime] was not a mistake that [the defendant] committed one day . . . . [T]his is an individual who makes a life . . . not only carrying this kind of firearm, but also preaching . . . the benefits of having this kind of firearm, the use you can give to them, expressing how you kill people, expressing how you don't care about human life."  Finally, the court posited that the lyrics and music videos were "the only way to tie the possession of that

- 9 -

gun with the [defendant's] intentions and what he has in his mind regarding that gun," so that the content of the songs called for a "[m]ajor deterrent sentence."

Implicit in this rationale is the assumption that the lyrics and music videos accurately reflect the defendant's motive, state of mind, personal characteristics, and the like.  But this assumption ignores the fact that much artistic expression, by its very nature, has an ambiguous relationship to the performer's personal views.[3]  That an actress plays Lady Macbeth, or a folk singer croons "Down in the Willow Garden," or an artist paints "Judith Beheading Holofernes," does not, without more, provide any objective evidence of the performer's motive for committing a crime, of his personal characteristics (beyond his ability to act, sing, or paint, as the case may be), or of any other sentencing factor.

This is not to say that a defendant can prevent a sentencing court's consideration of his words or conduct simply by couching those words or conduct in artistic form.  Evidence extrinsic to the protected words or conduct may make clear that a performance or artistic work speaks to a defendant's motive, state of mind, or some other attribute in a way that is relevant to

---

[3] At sentencing, the district court could not treat the defendant as more than a performer of the songs at issue here. The record is devoid of any evidence that the defendant composed the lyrics that were called to the court's attention.

sentencing.   In the absence of such extrinsic evidence, the mere fact that a defendant's crime happens to resemble some feature of his prior artistic expression cannot, by itself, establish the relevance of that expression to sentencing.

Evidence that might support such an inference is conspicuously lacking in this case.   Nothing in the record indicates that the lyrics or music videos had any direct application either to the defendant or to his lifestyle.   Nor is there any basis for a claim that they are unlawful in any respect. By like token, there is no hint that the defendant had any prior involvement with illegal firearms, much less with violence or murder.   The government did not so much as attempt to prove any uncharged conduct, nor did the district court make any findings about the defendant's involvement in any other criminal activity. To the contrary, the PSI Report — accepted in this regard both by the government and the district court — confirms that, at age 34, the defendant had no adult criminal history.

The district court's conclusions — that the lyrics and music videos comprised "objective evidence . . . that this [crime] was not a mistake," that they reflected that the defendant had a history of involvement "with firearms, with violence, [and] with murders," and that they made it likely that the defendant possessed the gun for nefarious purposes — thus rested entirely on naked inferences drawn from the content of the lyrics and music videos.

- 11 -

The record makes manifest that those inferences were drawn without any extrinsic evidence that the lyrics and music videos reflected anything other than performances akin to an actor inhabiting a role.

Appraising the district court's reasoning in this light throws into bold relief the differences between this case and the instances where protected conduct has been found to have been properly considered at sentencing. In such cases, there is typically no question but that the views expressed through the protected conduct — say, statements to the media, see United States v. Serrapio, 754 F.3d 1312, 1322-23 (11th Cir. 2014); Stewart, 686 F.3d at 164-65, how-to books authored by a defendant, see Kane, 452 F.3d at 142, or a defendant's advocacy for flouting the law, see Simkanin, 420 F.3d at 417-18 — accurately reflect the defendant's state of mind or other factors relevant to sentencing. In Kane, for example, the district court explicitly found that the content of the expressive conduct was not satire "meant only for entertainment purposes." 452 F.3d at 143. Where this link between protected conduct and factors relevant to sentencing is missing, the content of the artistic expression cannot be used to punish the defendant. On this record, that link has not been forged.

This gets the grease from the goose. Given the sentencing court's heavy reliance on protected conduct that was not tied through extrinsic evidence to any relevant sentencing

- 12 -

factor, its sentencing rationale is implausible.  This lack of plausibility is especially stark where — as in this case — the sentencing court undertook a sharp upward variance and, thus, assumed an obligation to provide a rationale "sufficiently compelling to support the degree of the variance." Gall, 552 U.S. at 50.  Taking the lyrics and music videos as "objective evidence" of factors relevant to sentencing, without an iota of corroborating evidence, results in a sentencing rationale wholly unsupported by the record.[4]  Like a house built upon a porous foundation, a sentence built upon a rationale that is unsupported by the record cannot stand.  See United States v. Ofray-Campos, 534 F.3d 1, 44 (1st Cir. 2008).

## III.  CONCLUSION

We need go no further.[5]  For the reasons elucidated above, we vacate the defendant's sentence and remand for resentencing consistent with this opinion.  We take no view of the appropriate length of the sentence to be imposed.

**Vacated and remanded.**

---

[4] To be sure, the district court alluded to other factors in imposing sentence — specifically, Puerto Rico's high crime rate and the quantity of ammunition that the defendant was carrying. The sentencing transcript leaves no doubt, though, that the lyrics and music videos dominated the court's thought process and constituted the driving force behind the upwardly variant sentence.

[5] We note that the defendant has put forth other arguments for vacating his sentence.  Given our conclusion that the sentence lacks a plausible sentencing rationale and is therefore substantively unreasonable, we need not address these arguments.

**APPENDIX**

For two of the Pacho y Cirilo works included in the PSI Report — "Dicen Que Vienen Por Mi" and "Como Grita El Palo" — the Report identifies specific lyrics performed by the defendant.  Those lyrics, with an explanatory footnote omitted, some expletives deleted, and minor alterations to capitalization, are reproduced below.  Intervening lyrics sung by other performers are denoted with an ellipsis.

**"Dicen Que Vienen Por Mi"**

. . .

THE ONES IN CONTROL ALQAEDAS INCORPORATED

. . .

Listen, these dudes are still getting together a group

To put them against me without them even knowing me

Mine know what we can give

They know we can go to war with the United States Army

They hold eighty meetings

They get 30 brown-nosers to join

They say they are heading this way 'cause they have millions

They get 10 rickety cars

And thirty rifle carrying guys

- 14 -

If they want to have 50 fine with me they are shitting their

pants

They call and cry uncle after they hear all of the ak

The same my posse have, all my cats

We are clear

They better listen

I already know they are aware of the way I live

I am passive if I'm treated right

But really bad if treated wrong

I am the kind that loves reggae and spraying them bullets

Humiliate them to their face to see them handle a few bucks

You don't have to be a millionaire to blow all his brains

. . .

These mother f---ers are dreamin'

With prized birdies

What the f--- are they saying

What rifle is to be oiled?

It must be the bb rifles being oiled by you,

Mine are the pure scene

And how do you want it to feel?

I will let you pick

The one you prefer

But hurry up

'Cause I don't have that much patience

- 15 -

My conscience will go on as it has to this day

Like a fool, you are not the first one I hit

. . .

Hey crazy we are hanging with D. Ozi daddy

You know we don't tape with softy, daddy

The tough ones with the tough ones

We have a short career but a lot of musical value

You know daddy

Stay parked and easy daddy

'Cause you know we don't play

. . .

I am hanging with Bozz daddy

The one in the f-----g track, Goldo

You even know our rhythms

The sound goes over

. . .

If these people doesn't want to help you out

It's because they're scared


**"Como Grita El Palo"**

. . .

(Listen, give me a break give me a chance at it too

To hit 'em all sons of bitches with the most elephant one)

I'm going about with a ski-mask and the moving notebook

Don't be braggin', your cat dances with the others at the Quiseven

There are many that have airs and go around causing them posses to split

You f--- around real low

Don't be braggin' to me, don't defy me

'Cause I'll go out on a mission and will crack your face on the steering wheel

We never let it down and we are always awake

And to anyone giving a concert we will take down their stage

We will empty the guitar and the show will be over

Don't be coming here to brag with a dirty 4-4

We're at the castle, another league all together

We are fine here, say what they may

We're at the castle, another league

We are eternal, see you in the other life

.  .  .